IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| MATTHEW KALMICK | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:25-cv-08893 |
| | ) | |
| | ) | |
| CURALEAF, INC. | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff Matthew Kalmick ("Plaintiff" or "Kalmick"), by and through his undersigned attorney, for his Complaint against Defendant Curaleaf, Inc. ("Defendant" or "Curaleaf"), alleges as follows:

### THE PARTIES
1. Plaintiff is an individual residing in Chicago, Illinois.
2. Defendant Curaleaf is a company incorporated and registered to do business in Illinois.

### JURISDICTION AND VENUE
3. Plaintiff's claims arise under the Illinois Whistleblower Protection Act ("Whistleblower Act"), 740 ILCS 174/1 et seq., the Illinois Human Rights Act, ("IHRA"), 775 ILCS 5/1 et seq. as amended by P.A. 98-1050 (Jan. 1, 2015), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., as amended. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.
4. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Defendant does business in this District and maintains offices in this District, and the unlawful conduct alleged in this Complaint occurred in this District.

### EXHAUSTION OF REMEDIES
5. Plaintiff timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Illinois Department of Human Rights (Charge No. 440-2025-00037).
6. The EEOC issued a Notice of Right to Sue on May 1, 2025, and this Complaint is filed within 90 days of receipt. Plaintiff has exhausted all administrative prerequisites to bring this lawsuit.

## FACTS

7. Kalmick has over 15 years of experience in compliance and management across industries such as finance and technology. Kalmick was hired by Grassroots Cannabis ("Grassroots") in December 2019 as the National Compliance Manager.
8. In April 2020, Curaleaf acquired Grassroots, and Kalmick was offered a position with Defendant as the Regional Compliance Director for the Central Region. Kalmick oversaw compliance for Curaleaf's Illinois, Michigan, Missouri, North Dakota ("ND"), Ohio, and Pennsylvania markets.
9. In June 2021, Kalmick left Curaleaf for a better offer at a competitor but left on exceptionally good terms.
10. In December 2021, Curaleaf had an opening for the same role in a different region. Kalmick applied for the position and was welcomed back by his former supervisor, James Shorris ("Shorris") in January 2022.
11. Kalmick returned as the Regional Compliance Director for the East region, and was responsible for compliance for Curaleaf's Connecticut, Maine, Maryland, Massachusetts, New Jersey, and New York markets. The company hired Kalmick back as a fully remote employee, with the understanding that he would remain in Chicago.
12. Although Kalmick was never promoted, Shorris consistently advocated for his promotion to Vice President during all three eligible review cycles.
13. Kalmick consistently received "exceeds expectations" ratings and was repeatedly praised for his strong relationships with business partners.
14. On or about October 9, 2023, Curaleaf CEO, Matthew Darin ("Darin") announced a corporate restructuring. Under the new structure, Kalmick reported with a "direct line" to Shorris and a "dotted line" to Senior Vice President ("SVP") Paul Chialdikas ("Chialdikas").
15. The restructuring caused widespread confusion among employees, who received inconsistent guidance from Curaleaf leadership regarding policies and expectations.
16. On or about September 25, 2023, Kalmick contacted Shorris to request clarity about the restructuring.
17. On or about October 20, 2023, Kalmick emailed Chief Legal Officer Peter Clateman ("Clateman"), copying Shorris, to confirm his willingness to commute to the East region as needed. Other Curaleaf employees, including seven in the Central region, were permitted similar arrangements. Kalmick's West Region counterpart, Kay Ann Tyssee ("Tyssee"), was allowed to fly weekly from Las Vegas to Scottsdale. Kalmick was never given an explanation as to why he was not afforded the same option.
18. In their first one-on-one meeting, Kalmick learned that Chialdikas was unaware of Curaleaf's Critical Incident Reporting Form ("CIRF") program—the company's centralized system for reporting compliance, safety, and security

2

concerns. This was alarming. When Kalmick raised compliance issues, Chialdikas would routinely steer the conversation away to general topics, avoiding the subject.

19. In November 2023, Shorris made gender-based criticisms of ND Compliance Director Whitney Montonye ("Montonye") in front of Kalmick, calling her "too pushy," "too aggressive," and "intimidating to some of her peers and colleagues." Kalmick doubted Shorris would describe a male employee in similar terms.

20. Later that month, Kalmick was reassigned from the East to Central region.

21. In early December 2023, Bresha Brewer ("Brewer"), Illinois Department of Agriculture ("IDOA") Division of Cannabis Bureau Chief, relayed to Illinois Senior Compliance Manager Ashley O'Brien ("O'Brien"), that the IDOA remained deeply concerned about conditions at Curaleaf's Litchfield cultivation facility. The agency had observed the same unresolved issues in multiple site visits over the prior nine months, including a vast amount of unaccounted-for inventory—raising suspicions of systemic diversion.

22. Brewer also flagged numerous environmental, health and safety ("EHS") concerns, including improperly stored chemicals, obstructed emergency exists, unlicensed pesticide use, and insufficient use of Personal Protective Equipment ("PPE"). These issues implicated violations of multiple state and federal laws, including the Cannabis Regulation and Tax Act (410 ILCS 705), Compassionate Use of Medical Cannabis Program Act (410 ILCS 130), Illinois Pesticide Act (415 ILCS 60), Federal Insecticide, Fungicide and Rodenticide Act (7 USC 136), Occupational Safety and Health Act (29 CFR 1910), and more.

23. Kalmick escalated the issues IDOA had identified to both Chialdikas and Mosley on or about December 8, 2023. Kalmick and O'Brien also had a call on or about December 11, 2023, with the local operations team to review the issues and begin planning for corrective action.

24. On or about December 15, 2023, Kalmick told Shorris that Chialdikas was ignoring the compliance issues Kalmick had escalated. When Kalmick mentioned Chialdikas' unfamiliarity with the CIRF program, Shorris responded that Chialdikas was "sneaky," and warned Kalmick not to confuse sneakiness for ignorance.

25. As inventory discrepancies persisted, the IDOA issued a new deficiency warning in early January 2024 for unlicensed pesticide use. Kalmick escalated the issue to Chialdikas and Shorris, who then relayed the concerns to Darin.

26. Kalmick observed a pattern in which Chialdikas increasingly excluded and isolated the Compliance team from the most serious issues at Litchfield. Initially, the exclusions occurred in internal discussions, but Kalmick later realized Chialdikas was working to sever Compliance's direct communication with the IDOA.

27. Chialdikas and Darin were clearly concerned about Compliance reporting suspected violations of state and federal law to the IDOA.

28. Despite the ongoing crisis at Litchfield, Central leadership showed a clear unwillingness to resolve the issues.
29. On or about January 8, 2024, during the annual review period, Shorris told Kalmick he had asked Chialdikas for input on Kalmick's performance and potential promotion. Chialdikas responded that he lacked sufficient interaction to form an opinion.
30. By January 24, 2024, Kalmick grew increasingly concerned by the lack of progress on IDOA-identified issues. He continued raising these concerns in his monthly compliance reports to Chialdikas.
31. On or about January 24, 2024, Montonye informed Kalmick that ND Operations Director Tyler King ("King") had told her that Chialdikas and Mosley were aware of ongoing non-compliance at the Fargo facility but were indifferent. King said they explicitly instructed him to bypass Compliance in the packaging and labeling approval process to meet production and sales targets. Montonye also said she tried to maintain oversight by requesting sample photos from King, which he failed to provide—presumably at their direction. When she proposed an alignment call with King and Operations Manager Katie Melquist, King replied he needed Mosley's approval. King's response reflected the enforcement of Chialdikas and Mosley's directive to sideline Compliance, despite such oversight being Curaleaf's standard operating procedure.
32. On or about January 25, 2024, Kalmick met with Chialdikas to address the directive for King to bypass Compliance. Compliance failures had already resulted in penalties from the ND Department of Health and the IDOA. Kalmick warned that mislabeling could pose serious health risks and financial loss, including product destruction.
33. By January 30, 2024, Compliance remained excluded as Illinois compliance issues worsened, and the Operations team failed to implement the IDOA's requested corrections.
34. On or about January 30, 2024, Kalmick messaged Chialdikas to reiterate that Compliance owned the relationship with the regulators in every market. He emphasized that Compliance was acting in the company's best interests by trying to prevent ongoing violations of state and federal law.
35. Also on or about January 30, 2024, Brewer contacted Chialdikas directly, excluding Compliance, contrary to standard procedure. She expressed concerns about potential systemic theft and requested surveillance footage showing a cut perimeter fence. Because Chialdikas failed to consult Compliance, his responses were delayed, incorrect, and incomplete.
36. Kalmick told Chialdikas it was highly unusual for a regulator to bypass Compliance with this type of inquiry. Chialdikas replied that he and Brewer had a "deep" relationship and said, "please don't interfere with that." Kalmick clarified that he was not trying to interfere, but the exchange alarmed him. He believed Chialdikas was actively undermining Compliance's relationship with regulators and promptly reported the incident to Shorris.

37. In February 2024, Shorris again made gender-based remarks about O'Brien in front of Kalmick, stating "would it kill her to smile," "she does not give me the warm and fuzzies," and "she has no bedside manner." That same month, Shorris repeated prior criticisms of Montonye in similarly gendered terms.
38. On or about February 13, 2024, O'Brien conducted a walk-through of the Litchfield facility in preparation for the IDOA's upcoming annual inspection the following week. She found that many inventory issues—some previously flagged by both her and the IDOA—remained unresolved in the state-mandated inventory tracking system, which serves as a critical safeguard against product diversion.
39. On or about February 14, 2024, during a routine visit, IDOA regulators expressed serious concern over units of missing, unlabeled, mislabeled, or unaccounted-for inventory. They ordered Curaleaf to halt all product shipments from the Litchfield facility until a full audit could be conducted. The regulators stated they would return the following week—during the scheduled annual audit—to focus solely on the vaults and assess remaining inventory issues.
40. On or about February 16, 2024, during a one-on-one meeting, Shorris warned Kalmick about troubling conduct by Central leadership, specifically stating that Darin appeared unusually "obsessed" with Kalmick.
41. On or about February 19 and 21, 2024, Kalmick visited the Litchfield site to meet with the IDOA regulators, including Brewer, IDOA Cannabis Inspector Josh Martin ("Martin"), and IDOA Plant and Pesticide Specialist Heston Eveland ("Eveland"), and observe their detailed inventory count. While most of the team was engaged and collaborative, Chialdikas remained isolated in a private office for most of the day. Kalmick periodically updated him on the progress.
42. At the end of the day, Chialdikas emerged from his office and requested a private meeting with Brewer before her departure. When Kalmick asked to join, Chialdikas refused. Both the Curaleaf and IDOA teams were asked to leave the conference room and wait in the hallway while Chialdikas met with Brewer alone—an unprecedented and highly irregular occurrence.
43. On or about February 20, 2024, during a bi-weekly state Compliance staff call, Kalmick raised the ongoing Litchfield crisis. He stated that the IDOA's December warning to improve the vault due to suspected diversion should have prompted immediate leadership action. Instead, it took the IDOA's threat to halt shipments for leadership to finally respond.
44. On or about February 22, 2024, during a one-on-one meeting with P&C Partner Meghan Barr ("Barr"), Curaleaf's equivalent of Human Resources, Kalmick reported Shorris' earlier statement that Darin was "obsessed" with him.
45. Also on or about February 22, 2024, Shorris noted that Compliance was still being blamed for ongoing issues and suggested Kalmick collaborate with Dorsett on a timeline documenting when Compliance had escalated those concerns.

46. Kalmick and his East Region counterpart, Andrew Dorsett ("Dorsett") compiled a timeline of every instance where Compliance escalated concerns to Chialdikas. The timeline showed at least twelve separate escalations.
47. During the week of February 27, 2024, Compliance held follow-up calls to discuss Litchfield. When Shorris briefly advocated for Compliance to lead communication with regulators, as was standard. Darin abruptly interrupted, saying "[Brewer] only wants to talk to us," referring to himself and Chialdikas.
48. In late February 2024, Kalmick reported Shorris' gender-based comments about Montonye to Barr, expressing his discomfort and belief that the remarks were based on gender.
49. On or about March 11, 2024, Shorris conducted Kalmick's annual review. As in prior years, it was very positive and noted that Kalmick "exceeded expectations." During the review, however, Shorris informed Kalmick that despite his strong performance and the support of both Shorris and Clateman, he would not be promoted to Vice President, a role Shorris had previously promise.
50. Shorris told Kalmick the promotion was denied because he hadn't been in the Chicago office enough. However, Dorsett—his East Region counterpart—was promoted to VP despite a weaker record by multiple measures. Although Dorsett had been ordered eight months earlier to relocate near his assigned office, he had not done so, and he had been on site even less than Kalmick. When Kalmick pointed out this disparity, Shorris offered no explanation.
51. Kalmick had actively worked to ensure compliance with state and federal health regulations by escalating issues and communicating with IDOA regulators. In contrast, Dorsett took a much more hands-off approach and had little engagement with state regulators.
52. Kalmick had nearly 15 years of experience leading large teams and almost 20 years managing compliance programs. Dorsett, by contrast, had only 3.5 years of compliance experience and entered management just three years earlier at Curaleaf. He frequently sought Kalmick's advice—even after Kalmick briefly left the company.
53. After being denied the promotion, Kalmick told both Shorris and Clateman that he believed he was being targeted and retaliated against for attempting to address serious health and safety violations by communicating with IDOA regulators.
54. On or about March 18, 2024, Kalmick and Shorris met again to discuss the promotion denial. Although Shorris had previously suggested a plan to promote Kalmick in mid-2024, he now said there were three reasons Darin and Chialdikas rejected the promotion: Kalmick's limited in-office presence, the Litchfield issues, and Darin's view that Kalmick was "aloof."
55. On or about March 28, 2024, Kalmick met with Barr to discuss the unusual circumstances surrounding his denied promotion. He expressed concern that Darin's "obsession" had turned retaliatory and that both Darin and Chialdikas had blocked his promotion for shifting and pretextual reasons. Barr expressed sympathy, and the meeting ended.

6

56. Later that same day, March 28, 2024, Kalmick again met with Barr to express concerns about Shorris' gender-based remarks regarding Montonye and O'Brien. Barr advised him to speak with Central Regional P&C Director Val Yedica ("Yedica").
57. On or about April 8, 2024, Kalmick introduced Shorris to Regional Quality Assurance Manager Tiffany Welborn ("Welborn"). When Kalmick later asked for feedback, Shorris responded that his first thought was "Oh, god," while mimicking Wellborn's body size with his arms. He then remarked, "she does actually seem to know her stuff," implying surprise given her appearance.
58. On or about April 19, 2024, Kalmick's attorney sent a Letter of Representation to Curaleaf's counsel, Christina Nutzman ("Nutzman"), stating that Kalmick had valid claims under the Illinois Whistleblower Act and sought to leave the company. Nutzman responded by promising to initiate an investigation.
59. On or about April 24, 2024, Employee Relations Manager Chris Gaughan ("Gaughan") met with Kalmick for a thirty-minute meeting to begin the investigation. Kalmick explained how Chialdikas had interfered with Compliance's communications with state regulators to avoid accountability for the issues at Litchfield. He stated he believed his denied promotion was retaliation for trying to work with those regulators.
60. Just hours after the investigation ended on or about April 24, 2024, Chialdikas sent Kalmick a recurring one-on-one meeting invite, something he had never previously done.
61. On or about April 25, 2024, during a call with Kalmick and Shorris, Chialdikas abruptly changed his tone and told Kalmick, "you own the relationship with the regulators."
62. Over the next week, Kalmick and O'Brien attempted to reengage IDOA regulators Brewer and her supervisor, David Lakeman ("Lakeman"), on several urgent issues, but received no response.
63. On or about May 8, 2024, Kalmick's attorney emailed Nutzman for an update on the investigation, which Gaughan had said would be completed by May 5. As Nutzman was out of the office, counsel also contacted Gaughan and Clateman, Nutzman's manager. Neither responded.
64. On or about May 9, 2024, Shorris called Kalmick to inform him that the investigation was closed and that his allegations had not been corroborated. Shorris added, "I assume this means you will be leaving the organization."
65. On or about May 10, 2024, during a meeting on an unrelated matter, Clateman brought up the investigation despite Kalmick's request to stay on topic. Clateman stated that no corroborating evidence had been found. He told Kalmick that "[Darin] and [Chialdikas] will welcome you back," that he was "still on the path for VP," and added, "making things up like this is something the younger generations do when they don't like their jobs anymore."
66. On or about May 14, 2024, Sam Tappa ("Tappa"), the most senior state Compliance Director, raised concerns about Clateman's "dismissive and shortsighted" pattern of protecting executives from accountability for compliance

7

violations. This dismissive behavior was part of the enforcement of an unwritten policy that interfered with Compliance's ability to address Curaleaf's violations of state and federal laws or regulations with the IDOA.

67. On or about May 15, 2024, Kalmick emailed Shorris to report a deterioration in the relationship between Brewer and O'Brien. He noted that prior to interference by Chialdikas and Darin, the relationship had been positive and even friendly.
68. In his response, Shorris wrote that it felt "like this relationship between [O'Brien] and the state and [O'Brien] and the business [referring to Chialdikas and Darin] is irretrievably broken." He further wrote, "I share the suspicion that [Chialdikas and Darin] may have poisoned it for good."
69. On or around May 16, 2024, Curaleaf's newly hired Chief Operations Officer, Jeremy Kacuba ("Kacuba"), a respected figure in cannabis operations, toured the Litchfield facility. Afterward, he described it as the "worst [he] [had] ever seen" citing the same EHS, pesticide, and systemic management failures Compliance had long reported.
70. On or about May 16, 2024, Kalmick spoke with Barr and expressed confusion and disappointed over the investigation's lack of thoroughness.
71. On or about May 16, 2024, Kalmick met with Shorris, who—for the first time—began criticizing Kalmick's performance. He questioned Kalmick about missing a recent facility visit, despite having approved the absence. Shorris also asked whether Kalmick had been going into the office. Kalmick said he had been periodically but admitted he hadn't gone recently, citing how uncomfortable Chialdikas had made things. Shorris warned, "you better be honest," and said he "got the sense" Kalmick had not been in the office.
72. During a call that same day, Shorris asked Kalmick to send a list of dates he had been in the office. Kalmick agreed to provide it.
73. On or about May 20, 2024, Kalmick emailed Gaughan to request the investigation be reopened. Gaughan replied, "My previous investigation focused solely on whether or not retaliation took place. I understand the allegations of retaliation where [sic] the result of compliance concerns that you raised, however, compliance concerns fall outside the scope of an employee relations ("ER") investigation."
74. Later that day, on or about May 20, 2024, Kalmick received a call from Shorris and Barr. Shorris informed Kalmick that he allegedly verified that Kalmick had not been present in the office enough, said dishonesty was a redline, and said there "was no coming back from that"—then terminated Kalmick. He provided no details about the number of days reviewed or time period considered. Despite previously requesting a list, Shorris never gave Kalmick the chance to submit it.
75. On May 21, 2024—the day after Kalmick's termination—Bader, who had previously benefited from Darin and Chialdikas redirecting blame from Operations to Compliance, was also terminated by Curaleaf.

8

76. On or about June 13, 2024, Montonye submitted her resignation, effective June 28, 2024, citing persistent isolation and marginalization by Chialdikas and Shorris.
77. On or about June 27, 2024, a P&C investigation was opened into Shorris' disparate treatment of women, as reported by Compliance team members in Curaleaf's Engagement Survey.

## COUNT I
## VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT
## 740CS 174/10

78. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.
79. Kalmick was an employee of Defendant, and Defendant was his employer as defined by the Act. 740 ILCS 174/5.
80. Section 10 of the IWA prohibits an employer to "make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency if the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/10.
81. Chialdikas, Darin, and Shorris enforced an unwritten policy that strongly discouraged or obstructed disclosures to regulatory agencies, including the IDOA, despite Kalmick having reasonable cause to believe such disclosures reported violations of state and federal law. Courts recognize that Section 10 of the Act is satisfied by unrecorded practices with equivalent effect. See *Strzykalski v. Board of Education*, No. 23 CV 1284, 2024 U.S. Dist. LEXIS 24873, at *8 (N.D. Ill. Feb. 13, 2024) (*See Mercer v. Favorite Healthcare Staffing, Inc.*, No. 22-CV-766, 2023 U.S. Dist. LEXIS 40577, 2023 WL 2456371, at *7-8 (N.D. Ill. Mar. 10, 2023); *Diadenko v. Folino*, 890 F.Supp.2d 975, 993 (N.D. Ill. 2012), *aff'd*, 741 F.3d 751 (7th Cir. 2013)).
82. Kalmick refused to cease communications with regulators and continued reporting conduct he believed violated various state and federal laws, including the Cannabis Regulation and Tax Act (410 ILCS 705), Compassionate Use of Medical Cannabis Program Act (410 ILCS 130), Illinois Pesticide Act (415 ILCS 60), Federal Insecticide, Fungicide and Rodenticide Act (7 USC 136), Occupational Safety and Health Act (29 CFR 1910), and more.
83. Defendant retaliated against Kalmick by denying him a promised promotion and ultimately terminating him because he refused to remain silent about what he reasonably believed were legal violations.
84. Defendant's stated reasons for denying the promotion were pretextual. Dorsett, who received the promotion instead, had less experience, had failed to relocate as required, and had a weaker management record. Kalmick, by contrast, had nearly 15 years of leadership experience, a stronger compliance record, and was regularly sought out for guidance—even by Dorsett.

9

85. Defendant's stated reason for Kalmick's termination—that he was dishonest about his office attendance—was also pretextual. Shorris never allowed Plaintiff to submit the attendance list he had requested. Moreover, Plaintiff was held to a stricter in-office standard than similarly situated employees, several of whom had lower attendance with no consequence.
86. As a result of Defendant's unlawful conduct, Plaintiff has suffered including loss of income, emotional distress, reputational harm, and other compensable injuries.

## COUNT II
## VIOLATION OF TITLE VII

87. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.
88. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a) prohibits retaliation against individuals who oppose, report, or participate in proceedings concerning unlawful employment practices, including gender discrimination.
89. In late February 2024, Plaintiff engaged in protected activity under Title VII by reporting to P&C Partner Barr that Shorris had made inappropriate gender-based comments about Compliance Director Montonye. Plaintiff reasonably believed these comments reflected unlawful sex-based bias.
90. On or about March 11, 2024, Plaintiff was denied a promotion to Vice President of Compliance for the Central Region—less than two weeks after his protected disclosure. This adverse employment action occurred in close temporal proximity to Plaintiff's report and supports a strong inference of retaliation.
91. Less than two months later, Defendant terminated Plaintiff on May 20, 2024—supporting a strong inference that the termination was in retaliation for protected activity.
92. Defendant failed to follow its own disciplinary policies and gave inconsistent reasons for Plaintiff's termination. Shorris cited "dishonesty," while the personnel file listed "performance issues." Plaintiff had a stellar record and was never placed on a performance improvement plan. These shifting explanations are evidence of pretext.
93. Plaintiff's belief that Shorris engaged in gender discrimination is further supported by Curaleaf's Compliance Department Engagement Survey, which documented concerns about gender bias in leadership. The findings included, in part, the following: "Compliance & Non-Compliance Leadership has exhibited biases towards different genders in the facilities. The perspective of male employees is favored while women in management roles are not included in important discussions. Having conversations with the HR team and/or the ethics hotline has been considered, but there's a lack of trust that anonymity will be maintained or retaliation may be experienced." Per Curaleaf Ethics Reporting

10

Policy, Shorris, in his role as Chief Compliance Officer, sits on the Ethics Committee that receives and reviews issues submitted via this hotline.

94. As a result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including loss of income, emotional distress, and reputational harm.

## COUNT III
## VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT

95. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.
96. The Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, et seq., prohibits retaliation against individuals who oppose, report, or participate in proceedings concerning unlawful discrimination under the Act.
97. In late February 2024, Plaintiff engaged in protected activity under the IHRA by reporting to P&C Partner Barr that Shorris had made inappropriate and gender-based remarks about Compliance Director Montonye, a woman. Plaintiff reasonably believed those comments—regarding her demeanor, tone, and leadership style—reflected gender bias and unlawful discrimination.
98. On or about March 11, 2024—less than two weeks later—Defendant denied Plaintiff a promotion to Vice President of Compliance for the Central Region. This adverse action occurred in close temporal proximity to his protected activity and supports a strong inference of retaliation. The decision was also pretextual, as Plaintiff was objectively more qualified than the individual who received the promotion.
99. On or about April 4, 2024, Plaintiff again engaged in protected activity by reporting that Shorris had subjected another female subordinate, Megan O'Brien, to disparate treatment on the basis of sex. Plaintiff reasonably believed this conduct also constituted unlawful discrimination under the IHRA.
100. On May 20, 2024, just six weeks after Plaintiff's second report, Defendant terminated him. Defendant failed to follow its own progressive discipline procedures and gave inconsistent reasons for his discharge. While Shorris cited "dishonesty," the personnel file listed "performance issues." Plaintiff had a consistent record of positive reviews and had never been placed on a performance improvement plan. These shifting justifications are evidence of pretext.
101. Plaintiff's belief that unlawful gender discrimination occurred is corroborated by the Compliance Department's 2024 Engagement Survey, which documented perceptions of gender bias in leadership, exclusion of women from key discussions, and fear of retaliation for reporting such concerns. Shorris, as Chief Compliance Officer, sat on the Ethics Committee responsible for reviewing such complaints. The findings of the survey included, in part, the following: "Compliance & Non-Compliance Leadership has exhibited biases towards different genders in the facilities. The perspective of male employees is favored while women in management roles are not included in important discussions. Having conversations with the HR team and/or the ethics hotline has been

considered, but there's a lack of trust that anonymity will be maintained or retaliation may be experienced." Per Curaleaf Ethics Reporting Policy, Shorris, in his role as Chief Compliance Officer, sits on the Ethics Committee that receives and reviews issues submitted via this hotline.

102. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages including loss of income, emotional distress, reputational harm, and other compensable injuries.

## COUNT IV
## RETALIATORY DISCHARGE AT COMMON LAW

103. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.
104. Under Illinois law, an employee may bring a claim for retaliatory discharge where the termination violates a clearly mandated policy. *See Brandon v. Anesthesia & Pain Mgt. Associates, Ltd.*, 277 F.3d 936, 940–41 (7th Cir. 2002).
105. Plaintiff complained in good faith about what he believed to be the enforcement of an unwritten policy that obstructed lawful disclosures to government regulators, including the IDOA, concerning violations of state and federal law.
106. Plaintiff also complained in good faith about what he believed to be gender-based discrimination by Shorris against O'Brien.
107. Defendant retaliated by denying Plaintiff a promotion and ultimately terminating him because he refused to stop reporting compliance violations and continued communication with regulators, and because he reported gender-based discrimination concerns.
108. As a result of Defendant's unlawful conduct, Plaintiff has suffered including loss of income, emotional distress, reputational harm, and other compensable injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the entry of judgment in his favor, and against Defendant and award the following relief:

1. Declare that the acts and conduct of Defendant are unlawful and violate the Illinois Whistleblower Act, the IHRA, Title VII, and common law;
2. Award Plaintiff the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;
3. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;
4. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of

       enjoyment of life, and other non-pecuniary losses;
5. Award Plaintiff pre-judgment and post-judgment interest;
6. Award Plaintiff punitive damages as appropriate;
7. Award Plaintiff attorneys' fees and costs; and
8. Award Plaintiff such other make-whole equitable, injunctive, and legal relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

                Respectfully submitted,

                Davina Rae DiPaolo

                Davina Rae DiPaolo, Esq.
                ARDC: 6335794
                Loftus & Eisenberg, Ltd.
                181 W Madison, Suite 4700
                Chicago, Illinois 60602
                o: (312) 899-6625
                c: (312) 772-4811
                davina@loftusandeisenberg.com