**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MATTHEW KALMICK,** | **)** | |
| | **)** | |
| **Plaintiff,** | **)** | **Case No. 1:25-cv-08893** |
| | **)** | |
| **v.** | **)** | **Hon. Jeffrey T. Gilbert** |
| | **)** | |
| **CURALEAF, INC.,** | **)** | |
| | **)** | |
| **Defendant.** | **)** | |

**DEFENDANT CURALEAF INC.'S AMENDED ANSWER AND**
**AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT**

NOW COMES Defendant Curaleaf, Inc.[1] ("Defendant" or "Curaleaf"), by and through its undersigned attorneys, and for its answer and affirmative defenses to Plaintiff Matthew Kalmick's ("Plaintiff" or "Kalmick") Complaint, states as follows:

**THE PARTIES**

1. Plaintiff is an individual residing in Chicago, Illinois.

**ANSWER:** **Curaleaf lacks information or knowledge sufficient to form a belief as to the truth of the allegations in Paragraph No. 1 and, therefore, denies the same.**

2. Defendant Curaleaf is a company incorporated and registered to do business in Illinois.

**ANSWER:** **Curaleaf admits it is registered to do business in Illinois. Curaleaf denies the remaining allegations Paragraph No. 2.**

**JURISDICTION AND VENUE**

3. Plaintiff's claims arise under the Illinois Whistleblower Protection Act ("Whistleblower Act"), 740 ILCS 174/1 et seq., the Illinois Human Rights Act, ("IHRA"), 775

[1] Plaintiff worked for Curaleaf Processing, Inc., which is wholly owned by Curaleaf, Inc.

ILCS 5/1 et seq. as amended by P.A. 98-1050 (Jan. 1, 2015), and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, et seq., as amended. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367.

**ANSWER: Curaleaf admits this lawsuit purports to bring claims under the Illinois Whistleblower Protection Act, the Illinois Human Rights Act, and Title VII of the Civil Rights Act of 1964, but Curaleaf denies that it violated the Illinois Whistleblower Protection Act, the Illinois Human Rights Act, and Title VII of the Civil Rights Act of 1964, and/or any other law, and further denies these allegations and conclusions. Answering further, Curaleaf admits this Court has jurisdiction over this matter.**

4. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b). Defendant does business in this District and maintains offices in this District, and the unlawful conduct alleged in this Complaint occurred in this District.

**ANSWER: Curaleaf admits venue is proper, but denies any unlawful conduct towards Plaintiff.**

**EXHAUSTION OF REMEDIES**

5. Plaintiff timely filed a charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Illinois Department of Human Rights (Charge No. 440-2025-00037).

**ANSWER: Paragraph No. 5 calls for a legal conclusion to which no response is required. To the extent an answer is required, Curaleaf admits Plaintiff filed a Charge of Discrimination with the EEOC, No. 440-2025-00037. Curaleaf lacks information or**

**knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 5 and, therefore, denies the same.**

6. The EEOC issued a Notice of Right to Sue on May 1, 2025, and this Complaint is filed within 90 days of receipt. Plaintiff has exhausted all administrative prerequisites to bring this lawsuit.

**ANSWER: Paragraph No. 6 calls for a legal conclusion to which no response is required. To the extent an answer is required, Curaleaf admits the EEOC issued a Dismissal and Right to Sue Notice on or around May 1, 2025, but lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 6 and, therefore, denies the same.**

**FACTS**

7. Kalmick has over 15 years of experience in compliance and management across industries such as finance and technology. Kalmick was hired by Grassroots Cannabis ("Grassroots") in December 2019 as the National Compliance Manager.

**ANSWER: Upon information and belief, Curaleaf admits Grassroots hired Plaintiff in or around December 2019 as a National Compliance Manager. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 7 and, therefore, denies the same.**

8. In April 2020, Curaleaf acquired Grassroots, and Kalmick was offered a position with Defendant as the Regional Compliance Director for the Central Region. Kalmick oversaw compliance for Curaleaf's Illinois, Michigan, Missouri, North Dakota ("ND"), Ohio, and Pennsylvania markets.

**ANSWER: Curaleaf admits it acquired Grassroots in 2020. Curaleaf further admits it offered Plaintiff a position as the Regional Compliance Director for the Central Region, and Plaintiff oversaw those markets at certain periods during his term of employment with Curaleaf. Curaleaf denies the remaining allegations in Paragraph No. 8.**

9. In June 2021, Kalmick left Curaleaf for a better offer at a competitor but left on exceptionally good terms.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to why Plaintiff left his employment with Curaleaf in June 2021 and, therefore, denies this allegation. Curaleaf admits Plaintiff left on good terms. Curaleaf denies the remaining allegations in Paragraph No. 9.**

10. In December 2021, Curaleaf had an opening for the same role in a different region. Kalmick applied for the position and was welcomed back by his former supervisor, James Shorris ("Shorris") in January 2022.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 10.**

11. Kalmick returned as the Regional Compliance Director for the East region, and was responsible for compliance for Curaleaf's Connecticut, Maine, Maryland, Massachusetts, New Jersey, and New York markets. The company hired Kalmick back as a fully remote employee, with the understanding that he would remain in Chicago.

**ANSWER: Curaleaf admits Plaintiff returned as the Regional Compliance Director for the East region, was responsible for compliance for Curaleaf's Connecticut, Maine, Maryland, Massachusetts, New Jersey, and New York Markets, was hired as a remote employee at that time with the expectation that he would conduct work-related activities at**

**other locations as needed, and was hired with the understanding that he would remain in Chicago at that time. Curaleaf denies the remaining allegations in Paragraph No. 11.**

12. Although Kalmick was never promoted, Shorris consistently advocated for his promotion to Vice President during all three eligible review cycles.

**ANSWER: Curaleaf admits Shorris advocated for Plaintiff's promotion to Vice President. Curaleaf lacks information or knowledge sufficient to form a belief as to the number of review cycles Shorris advocated for Plaintiff and, therefore, denies the remaining allegations in Paragraph No. 12.**

13. Kalmick consistently received "exceeds expectations" ratings and was repeatedly praised for his strong relationships with business partners.

**ANSWER: Defendant admits Plaintiff received "exceeds expectations" ratings at times. Defendant denies the remaining allegations in Paragraph No. 13.**

14. On or about October 9, 2023, Curaleaf CEO, Matthew Darin ("Darin") announced a corporate restructuring. Under the new structure, Kalmick reported with a "direct line" to Shorris and a "dotted line" to Senior Vice President ("SVP") Paul Chialdikas ("Chialdikas").

**ANSWER: Curaleaf admits the allegations in Paragraph No. 14.**

15. The restructuring caused widespread confusion among employees, who received inconsistent guidance from Curaleaf leadership regarding policies and expectations.

**ANSWER: Defendant denies the allegations in Paragraph No. 15.**

16. On or about September 25, 2023, Kalmick contacted Shorris to request clarity about the restructuring.

**ANSWER: Curaleaf admits Kalmick may have asked Shorris about the restructuring. Defendant denies the remaining allegations in Paragraph No. 16.**

17. On or about October 20, 2023, Kalmick emailed Chief Legal Officer Peter Clateman ("Clateman"), copying Shorris, to confirm his willingness to commute to the East region as needed. Other Curaleaf employees, including seven in the Central region, were permitted similar arrangements. Kalmick's West Region counterpart, Kay Ann Tyssee ("Tyssee"), was allowed to fly weekly from Las Vegas to Scottsdale. Kalmick was never given an explanation as to why he was not afforded the same option.

**ANSWER: Curaleaf admits Plaintiff sent an email to Clateman on or about October 20, 2023, indicating that he would travel to the East region as needed, among other things. Answering further, Plaintiff's counterparts lived in or were actively relocating to the Region they managed. Curaleaf denies the remaining allegations in Paragraph No. 17.**

18. In their first one-on-one meeting, Kalmick learned that Chialdikas was unaware of Curaleaf's Critical Incident Reporting Form ("CIRF") program—the company's centralized system for reporting compliance, safety, and security concerns. This was alarming. When Kalmick raised compliance issues, Chialdikas would routinely steer the conversation away to general topics, avoiding the subject.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to what Plaintiff learned and/or thought and, therefore, denies the same. Curaleaf denies the remaining allegations in Paragraph No. 18.**

19. In November 2023, Shorris made gender-based criticisms of ND Compliance Director Whitney Montonye ("Montonye") in front of Kalmick, calling her "too pushy," "too aggressive," and "intimidating to some of her peers and colleagues." Kalmick doubted Shorris would describe a male employee in similar terms.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to how and/or what Plaintiff thought and, therefore, denies those allegations. Curaleaf denies the remaining allegations in Paragraph No. 19.**

20. Later that month, Kalmick was reassigned from the East to Central region.

**ANSWER: Curaleaf admits it reassigned Plaintiff from the East Region to the Central Region.**

21. In early December 2023, Bresha Brewer ("Brewer"), Illinois Department of Agriculture ("IDOA") Division of Cannabis Bureau Chief, relayed to Illinois Senior Compliance Manager Ashley O'Brien ("O'Brien"), that the IDOA remained deeply concerned about conditions at Curaleaf's Litchfield cultivation facility. The agency had observed the same unresolved issues in multiple site visits over the prior nine months, including a vast amount of unaccounted-for inventory—raising suspicions of systemic diversion.

**ANSWER: Curaleaf admits Brewer relayed concerns related to issues at the Litchfield cultivation facility to O'Brien. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 21 and, therefore, denies the same.**

22. Brewer also flagged numerous environmental, health and safety ("EHS") concerns, including improperly stored chemicals, obstructed emergency exists, unlicensed pesticide use, and insufficient use of Personal Protective Equipment ("PPE"). These issues implicated violations of multiple state and federal laws, including the Cannabis Regulation and Tax Act (410 ILCS 705), Compassionate Use of Medical Cannabis Program Act (410 ILCS 130), Illinois Pesticide Act (415 ILCS 60), Federal Insecticide, Fungicide and Rodenticide Act (7 USC 136), Occupational Safety and Health Act (29 CFR 1910), and more.

**ANSWER: Paragraph No. 22 calls for a legal conclusion to which no response is required. To the extent an answer is required, Curaleaf admits Brewer flagged several issues. Curaleaf denies the remaining allegations in Paragraph No. 22.**

23. Kalmick escalated the issues IDOA had identified to both Chialdikas and Mosley on or about December 8, 2023. Kalmick and O'Brien also had a call on or about December 11, 2023, with the local operations team to review the issues and begin planning for corrective action.

**ANSWER: Curaleaf admits Plaintiff escalated IDOA issues on or about December 8, 2023. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 23 and, therefore, denies the same.**

24. On or about December 15, 2023, Kalmick told Shorris that Chialdikas was ignoring the compliance issues Kalmick had escalated. When Kalmick mentioned Chialdikas' unfamiliarity with the CIRF program, Shorris responded that Chialdikas was "sneaky," and warned Kalmick not to confuse sneakiness for ignorance.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 24.**

25. As inventory discrepancies persisted, the IDOA issued a new deficiency warning in early January 2024 for unlicensed pesticide use. Kalmick escalated the issue to Chialdikas and Shorris, who then relayed the concerns to Darin.

**ANSWER: Curaleaf admits IDOA took issue with Curaleaf's Litchfield, Illinois facility in early January 2024. Curaleaf denies the IDOA issued a new deficiency warning in early January 2024 for unlicensed pesticide use. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 25 and, therefore, denies the same.**

26. Kalmick observed a pattern in which Chialdikas increasingly excluded and isolated the Compliance team from the most serious issues at Litchfield. Initially, the exclusions occurred in internal discussions, but Kalmick later realized Chialdikas was working to sever Compliance's direct communication with the IDOA.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to how Plaintiff felt and/or what he observed and, therefore, denies those allegations. Curaleaf denies the remaining allegations in Paragraph No. 26.**

27. Chialdikas and Darin were clearly concerned about Compliance reporting suspected violations of state and federal law to the IDOA.

**ANSWER: Curaleaf admits there were concerns about suspected violations being reported to the IDOA. Answering further, Curaleaf never prohibited Compliance from reporting anything to the IDOA. Curaleaf denies the remaining allegation in Paragraph No. 27.**

28. Despite the ongoing crisis at Litchfield, Central leadership showed a clear unwillingness to resolve the issues.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 28.**

29. On or about January 8, 2024, during the annual review period, Shorris told Kalmick he had asked Chialdikas for input on Kalmick's performance and potential promotion. Chialdikas responded that he lacked sufficient interaction to form an opinion.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 29.**

30. By January 24, 2024, Kalmick grew increasingly concerned by the lack of progress on IDOA-identified issues. He continued raising these concerns in his monthly compliance reports to Chialdikas.

**<u>ANSWER</u>: Curaleaf lacks information or knowledge sufficient to form a belief as to how Plaintiff felt and, therefore, denies these allegations. Curaleaf admits Plaintiff raised issues during his monthly compliance reports. Curaleaf denies the remaining allegations in Paragraph No. 30.**

31. On or about January 24, 2024, Montonye informed Kalmick that ND Operations Director Tyler King ("King") had told her that Chialdikas and Mosley were aware of ongoing non-compliance at the Fargo facility but were indifferent. King said they explicitly instructed him to bypass Compliance in the packaging and labeling approval process to meet production and sales targets. Montonye also said she tried to maintain oversight by requesting sample photos from King, which he failed to provide—presumably at their direction. When she proposed an alignment call with King and Operations Manager Katie Melquist, King replied he needed Mosley's approval. King's response reflected the enforcement of Chialdikas and Mosley's directive to sideline Compliance, despite such oversight being Curaleaf's standard operating procedure.

**<u>ANSWER</u>: Curaleaf denies there was a directive to sideline Compliance. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 31 and, therefore, denies the same.**

32. On or about January 25, 2024, Kalmick met with Chialdikas to address the directive for King to bypass Compliance. Compliance failures had already resulted in penalties from the ND Department of Health and the IDOA. Kalmick warned that mislabeling could pose serious health risks and financial loss, including product destruction.

**<u>ANSWER</u>: Curaleaf denies the allegations in Paragraph No. 32.**

33. By January 30, 2024, Compliance remained excluded as Illinois compliance issues worsened, and the Operations team failed to implement the IDOA's requested corrections.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 33.**

34. On or about January 30, 2024, Kalmick messaged Chialdikas to reiterate that Compliance owned the relationship with the regulators in every market. He emphasized that Compliance was acting in the company's best interests by trying to prevent ongoing violations of state and federal law.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph No. 34 and, therefore, denies the same.**

35. Also on or about January 30, 2024, Brewer contacted Chialdikas directly, excluding Compliance, contrary to standard procedure. She expressed concerns about potential systemic theft and requested surveillance footage showing a cut perimeter fence. Because Chialdikas failed to consult Compliance, his responses were delayed, incorrect, and incomplete.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 35.**

36. Kalmick told Chialdikas it was highly unusual for a regulator to bypass Compliance with this type of inquiry. Chialdikas replied that he and Brewer had a "deep" relationship and said, "please don't interfere with that." Kalmick clarified that he was not trying to interfere, but the exchange alarmed him. He believed Chialdikas was actively undermining Compliance's relationship with regulators and promptly reported the incident to Shorris.

**ANSWER: Curaleaf admits Plaintiff and Chialdikas discussed Chialdikas's professional relationship with Brewer. Answering further, Curaleaf states it did not circumvent any policies or systems. Curaleaf denies the remaining allegations in Paragraph No. 36.**

37. In February 2024, Shorris again made gender-based remarks about O'Brien in front of Kalmick, stating "would it kill her to smile," "she does not give me the warm and fuzzies," and

"she has no bedside manner." That same month, Shorris repeated prior criticisms of Montonye in similarly gendered terms.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 37.**

38. On or about February 13, 2024, O'Brien conducted a walk-through of the Litchfield facility in preparation for the IDOA's upcoming annual inspection the following week. She found that many inventory issues—some previously flagged by both her and the IDOA—remained unresolved in the state-mandated inventory tracking system, which serves as a critical safeguard against product diversion.

**ANSWER: Curaleaf admits O'Brien conducted a walk-through of the Litchfield facility in February 2024 and found that many inventory issues remained unresolved. Curaleaf lacks information or knowledge sufficient to form a belief as to the remaining allegations in Paragraph No. 38 and, therefore, denies the same.**

39. On or about February 14, 2024, during a routine visit, IDOA regulators expressed serious concern over units of missing, unlabeled, mislabeled, or unaccounted-for inventory. They ordered Curaleaf to halt all product shipments from the Litchfield facility until a full audit could be conducted. The regulators stated they would return the following week—during the scheduled annual audit—to focus solely on the vaults and assess remaining inventory issues.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 39.**

40. On or about February 16, 2024, during a one-on-one meeting, Shorris warned Kalmick about troubling conduct by Central leadership, specifically stating that Darin appeared unusually "obsessed" with Kalmick.

**ANSWER: Curaleaf admits Shorris told Plaintiff that Darin appeared to be obsessed about Plaintiff's time (or lack thereof) in the office. Curaleaf denies the remaining allegations in Paragraph No. 40.**

41. On or about February 19 and 21, 2024, Kalmick visited the Litchfield site to meet with the IDOA regulators, including Brewer, IDOA Cannabis Inspector Josh Martin ("Martin"), and IDOA Plant and Pesticide Specialist Heston Eve-land ("Eveland"), and observe their detailed inventory count. While most of the team was engaged and collaborative, Chialdikas remained isolated in a private office for most of the day. Kalmick periodically updated him on the progress.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 41.**

42. At the end of the day, Chialdikas emerged from his office and requested a private meeting with Brewer before her departure. When Kalmick asked to join, Chialdikas refused. Both the Curaleaf and IDOA teams were asked to leave the conference room and wait in the hallway while Chialdikas met with Brewer alone—an unprecedented and highly irregular occurrence.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 42.**

43. On or about February 20, 2024, during a bi-weekly state Compliance staff call, Kalmick raised the ongoing Litchfield crisis. He stated that the IDOA's December warning to improve the vault due to suspected diversion should have prompted immediate leadership action. Instead, it took the IDOA's threat to halt shipments for leadership to finally respond.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph No. 43 and, therefore, denies the same.**

44. On or about February 22, 2024, during a one-on-one meeting with P&C Partner Meghan Barr ("Barr"), Curaleaf's equivalent of Human Resources, Kalmick reported Shorris' earlier statement that Darin was "obsessed" with him.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 44.**

45. Also on or about February 22, 2024, Shorris noted that Compliance was still being blamed for ongoing issues and suggested Kalmick collaborate with Dorsett on a timeline documenting when Compliance had escalated those concerns.

**ANSWER: Curaleaf admits that Shorris suggested Plaintiff collaborate with Dorsett on a timeline about escalation. Curaleaf denies the remaining allegations in Paragraph No. 45.**

46. Kalmick and his East Region counterpart, Andrew Dorsett ("Dorsett") compiled a timeline of every instance where Compliance escalated concerns to Chialdikas. The timeline showed at least twelve separate escalations.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 46.**

47. During the week of February 27, 2024, Compliance held follow-up calls to discuss Litchfield. When Shorris briefly advocated for Compliance to lead communication with regulators, as was standard. Darin abruptly interrupted, saying "[Brewer] only wants to talk to us," referring to himself and Chialdikas.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph No. 47 and, therefore, denies the same.**

48. In late February 2024, Kalmick reported Shorris' gender-based comments about Montonye to Barr, expressing his discomfort and belief that the remarks were based on gender.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 48.**

49. On or about March 11, 2024, Shorris conducted Kalmick's annual review. As in prior years, it was very positive and noted that Kalmick "exceeded expectations." During the review, however, Shorris informed Kalmick that despite his strong performance and the support of

both Shorris and Clateman, he would not be promoted to Vice President, a role Shorris had previously promise.

**ANSWER: Curaleaf admits Shorris gave Plaintiff a positive review and advised Plaintiff that he would not be promoted to Vice President at that time. Answering further, Shorris did not promise Plaintiff a promotion, and Clateman did not advocate for Plaintiff's promotion. Curaleaf denies the remaining allegations in Paragraph No. 49.**

50. Shorris told Kalmick the promotion was denied because he hadn't been in the Chicago office enough. However, Dorsett—his East Region counterpart—was promoted to VP despite a weaker record by multiple measures. Although Dorsett had been ordered eight months earlier to relocate near his assigned office, he had not done so, and he had been on site even less than Kalmick. When Kalmick pointed out this disparity, Shorris offered no explanation.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 50. Answering further, Dorsett was in the process of relocating to his new assigned office.**

51. Kalmick had actively worked to ensure compliance with state and federal health regulations by escalating issues and communicating with IDOA regulators. In contrast, Dorsett took a much more hands-off approach and had little engagement with state regulators.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 51.**

52. Kalmick had nearly 15 years of experience leading large teams and almost 20 years managing compliance programs. Dorsett, by contrast, had only 3.5 years of compliance experience and entered management just three years earlier at Curaleaf. He frequently sought Kalmick's advice—even after Kalmick briefly left the company.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 52.**

53. After being denied the promotion, Kalmick told both Shorris and Clateman that he believed he was being targeted and retaliated against for attempting to address serious health and safety violations by communicating with IDOA regulators.

**ANSWER: Curaleaf admits Plaintiff was upset after not being promoted and spoke with Shorris and Clateman about his discontent. Curaleaf denies the remaining allegations in Paragraph No. 53.**

54. On or about March 18, 2024, Kalmick and Shorris met again to discuss the promotion denial. Although Shorris had previously suggested a plan to promote Kalmick in mid-2024, he now said there were three reasons Darin and Chialdikas rejected the promotion: Kalmick's limited in-office presence, the Litchfield issues, and Darin's view that Kalmick was "aloof."

**ANSWER: Curaleaf admits the allegations in Paragraph No. 54. Answering further, Curaleaf had additional reasons for not promoting Plaintiff at that time.**

55. On or about March 28, 2024, Kalmick met with Barr to discuss the unusual circumstances surrounding his denied promotion. He expressed concern that Darin's "obsession" had turned retaliatory and that both Darin and Chialdikas had blocked his promotion for shifting and pretextual reasons. Barr expressed sympathy, and the meeting ended.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 55.**

56. Later that same day, March 28, 2024, Kalmick again met with Barr to express concerns about Shorris' gender-based remarks regarding Montonye and O'Brien. Barr advised him to speak with Central Regional P&C Director Val Yedica ("Yedica").

**ANSWER: Curaleaf denies the allegations in Paragraph No. 56.**

57. On or about April 8, 2024, Kalmick introduced Shorris to Regional Quality Assurance Manager Tiffany Welborn ("Welborn"). When Kalmick later asked for feedback, Shorris responded that his first thought was "Oh, god," while mimicking Wellborn's body size with his arms. He then remarked, "she does actually seem to know her stuff," implying surprise given her appearance.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 57.**

58. On or about April 19, 2024, Kalmick's attorney sent a Letter of Representation to Curaleaf's counsel, Christina Nutzman ("Nutzman"), stating that Kalmick had valid claims under the Illinois Whistleblower Act and sought to leave the company. Nutzman responded by promising to initiate an investigation.

**ANSWER: Curaleaf admits the allegation in Paragraph No. 58, but denies any wrongdoing towards Plaintiff.**

59. On or about April 24, 2024, Employee Relations Manager Chris Gaughan ("Gaughan") met with Kalmick for a thirty-minute meeting to begin the investigation. Kalmick explained how Chialdikas had interfered with Compliance's communications with state regulators to avoid accountability for the issues at Litchfield. He stated he believed his denied promotion was retaliation for trying to work with those regulators.

**ANSWER: Curaleaf admits the allegation in Paragraph No. 59, but denies any wrongdoing.**

60. Just hours after the investigation ended on or about April 24, 2024, Chialdikas sent Kalmick a recurring one-on-one meeting invite, something he had never previously done.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 60.**

61. On or about April 25, 2024, during a call with Kalmick and Shorris, Chialdikas abruptly changed his tone and told Kalmick, "you own the relationship with the regulators."

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph No. 61 and, therefore, denies the same.**

62. Over the next week, Kalmick and O'Brien attempted to reengage IDOA regulators Brewer and her supervisor, David Lakeman ("Lakeman"), on several urgent issues, but received no response.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to the allegations in Paragraph No. 62 and, therefore, denies the same.**

63. On or about May 8, 2024, Kalmick's attorney emailed Nutzman for an update on the investigation, which Gaughan had said would be completed by May 5. As Nutzman was out of the office, counsel also contacted Gaughan and Clateman, Nutzman's manager. Neither responded.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 63.**

64. On or about May 9, 2024, Shorris called Kalmick to inform him that the investigation was closed and that his allegations had not been corroborated. Shorris added, "I assume this means you will be leaving the organization."

**ANSWER: Curaleaf denies the allegations in Paragraph No. 64.**

65. On or about May 10, 2024, during a meeting on an unrelated matter, Clateman brought up the investigation despite Kalmick's request to stay on topic. Clateman stated that no corroborating evidence had been found. He told Kalmick that "[Darin] and [Chialdikas] will welcome you back," that he was "still on the path for VP," and added, "making things up like this is something the younger generations do when they don't like their jobs anymore."

**ANSWER: Curaleaf denies the allegations in Paragraph No. 65.**

66. On or about May 14, 2024, Sam Tappa ("Tappa"), the most senior state Compliance Director, raised concerns about Clateman's "dismissive and shortsighted" pattern of protecting executives from accountability for compliance violations. This dismissive behavior was part of the enforcement of an unwritten policy that interfered with Compliance's ability to address Curaleaf's violations of state and federal laws or regulations with the IDOA.

**ANSWER: Curaleaf admits Tappa raised concerns during a meeting on or about May 14, 2024. Curaleaf denies the remaining allegations in Paragraph No. 66.**

67. On or about May 15, 2024, Kalmick emailed Shorris to report a deterioration in the relationship between Brewer and O'Brien. He noted that prior to interference by Chialdikas and Darin, the relationship had been positive and even friendly.

**ANSWER: Curaleaf admits Plaintiff emailed Shorris on or about May 15, 2024, regarding the relationship between Brewer and O'Brien and an alleged deterioration thereof. Curaleaf denies Plaintiff's characterization of the relationship between other parties. Curaleaf denies the remaining allegations in Paragraph No. 67.**

68. In his response, Shorris wrote that it felt "like this relationship between [O'Brien] and the state and [O'Brien] and the business [referring to Chialdikas and Darin] is irretrievably broken." He further wrote, "I share the suspicion that [Chialdikas and Darin] may have poisoned it for good."

**ANSWER: Curaleaf admits Shorris responded to Plaintiff's allegations surmising that O'Brien's relationship with the state and with the business was broken. Defendant denies the remaining allegations in Paragraph No. 68.**

69. On or around May 16, 2024, Curaleaf's newly hired Chief Operations Officer, Jeremy Kacuba ("Kacuba"), a respected figure in cannabis operations, toured the Litchfield facility. Afterward, he described it as the "worst [he] [had] ever seen" citing the same EHS, pesticide, and systemic management failures Compliance had long reported.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 69.**

70. On or about May 16, 2024, Kalmick spoke with Barr and expressed confusion and disappointed over the investigation's lack of thoroughness.

**ANSWER: Curaleaf admits Plaintiff spoke with Barr after the investigation concluded. Curaleaf denies the remaining allegations in Paragraph No. 70.**

71. On or about May 16, 2024, Kalmick met with Shorris, who—for the first time—began criticizing Kalmick's performance. He questioned Kalmick about missing a recent facility visit, despite having approved the absence. Shorris also asked whether Kalmick had been going into the office. Kalmick said he had been periodically but admitted he hadn't gone recently, citing how uncomfortable Chialdikas had made things. Shorris warned, "you better be honest," and said he "got the sense" Kalmick had not been in the office.

**ANSWER: Curaleaf admits Shorris spoke with Plaintiff about his performance as well as Plaintiff's lack of in-person presence at the Chicago office. Curaleaf denies the remaining allegations in Paragraph No. 71.**

72. During a call that same day, Shorris asked Kalmick to send a list of dates he had been in the office. Kalmick agreed to provide it.

**ANSWER: Curaleaf admits the allegations in Paragraph No. 72.**

73. On or about May 20, 2024, Kalmick emailed Gaughan to request the investigation be reopened. Gaughan replied, "My previous investigation focused solely on whether or not

retaliation took place. I understand the allegations of retaliation where [sic] the result of compliance concerns that you raised, however, compliance concerns fall outside the scope of an employee relations ("ER") investigation."

**ANSWER: Curaleaf admits the allegations in Paragraph No. 73.**

74. Later that day, on or about May 20, 2024, Kalmick received a call from Shorris and Barr. Shorris informed Kalmick that he allegedly verified that Kalmick had not been present in the office enough, said dishonesty was a redline, and said there "was no coming back from that"—then terminated Kalmick. He provided no details about the number of days reviewed or time period considered. Despite previously requesting a list, Shorris never gave Kalmick the chance to submit it.

**ANSWER: Curaleaf admits Shorris and Barr spoke with Plaintiff on or about May 20, 2024, discussed Plaintiff's lack of in-person presence at Curaleaf's Chicago office as well as Plaintiff's lack of honesty, and terminated Plaintiff. Curaleaf denies the remaining allegations in Paragraph No. 74.**

75. On May 21, 2024—the day after Kalmick's termination—Bader, who had previously benefited from Darin and Chialdikas redirecting blame from Operations to Compliance, was also terminated by Curaleaf.

**ANSWER: Curaleaf admits it terminated Bader's employment on or about May 21, 2024. Curaleaf denies the remaining allegations in Paragraph No. 75.**

76. On or about June 13, 2024, Montonye submitted her resignation, effective June 28, 2024, citing persistent isolation and marginalization by Chialdikas and Shorris.

**ANSWER: Curaleaf admits Montonye resigned from Curaleaf in June 2024. Curaleaf denies the remaining allegations in Paragraph No. 76.**

77. On or about June 27, 2024, a P&C investigation was opened into Shorris' disparate treatment of women, as reported by Compliance team members in Curaleaf's Engagement Survey.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 77.**

**COUNT I**
**VIOLATION OF THE ILLINOIS WHISTLEBLOWER ACT**
**740 CS 174/10**

78. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

**ANSWER: Curaleaf restates and re-alleges its answers to all other Paragraphs of this Complaint as though fully set forth herein.**

79. Kalmick was an employee of Defendant, and Defendant was his employer as defined by the Act. 740 ILCS 174/5.

**ANSWER: Paragraph No. 79 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf states that the Illinois Whistleblower Act speaks for itself, and Curaleaf denies any allegation in Paragraph No. 79 that is inconsistent therewith. Answering further, Curaleaf admits Kalmick was an employee.**

80. Section 10 of the IWA prohibits an employer to "make, adopt, or enforce any rule, regulation, or policy preventing an employee from disclosing information to a government or law enforcement agency if the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS 174/10.

**ANSWER: This Court dismissed Plaintiff's Whistleblower claim brought under Section 10 of the Act, and, thus, no answer is needed for Paragraph 80. [*See* Dkt. 26, dated February 2, 2026].**

81. Chialdikas, Darin, and Shorris enforced an unwritten policy that strongly discouraged or obstructed disclosures to regulatory agencies, including the IDOA, despite Kalmick having reasonable cause to believe such disclosures reported violations of state and federal law. Courts recognize that Section 10 of the Act is satisfied by unrecorded practices with equivalent effect. *See Strzykalski v. Board of Education*, No. 23 CV 1284, 2024 U.S. Dist. LEXIS 24873, at *8 (N.D. Ill. Feb. 13, 2024) (*See Mercer v. Favorite Healthcare Staffing, Inc.*, No. 22-CV-766, 2023 U.S. Dist. LEXIS 40577, 2023 WL 2456371, at *7-8 (N.D. Ill. Mar. 10, 2023); *Diadenko v. Folino*, 890 F.Supp.2d 975, 993 (N.D. Ill. 2012), *aff'd*, 741 F.3d 751 (7th Cir. 2013)).

**ANSWER: Paragraph No. 81 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf states that the cited case law speaks for itself, and Curaleaf denies any allegation in Paragraph No. 81 that is inconsistent therewith. Curaleaf denies the remaining allegations in Paragraph No. 81.**

82. Kalmick refused to cease communications with regulators and continued reporting conduct he believed violated various state and federal laws, including the Cannabis Regulation and Tax Act (410 ILCS 705), Compassionate Use of Medical Cannabis Program Act (410 ILCS 130), Illinois Pesticide Act (415 ILCS 60), Federal Insecticide, Fungicide and Rodenticide Act (7 USC 136), Occupational Safety and Health Act (29 CFR 1910), and more.

**ANSWER: Curaleaf lacks information or knowledge sufficient to form a belief as to what Plaintiff believed or how he felt and, therefore, denies the same. Curaleaf denies the remaining allegations in Paragraph No. 82.**

83. Defendant retaliated against Kalmick by denying him a promised promotion and ultimately terminating him because he refused to remain silent about what he reasonably believed were legal violations.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 83.**

84. Defendant's stated reasons for denying the promotion were pretextual. Dorsett, who received the promotion instead, had less experience, had failed to relocate as required, and had a weaker management record. Kalmick, by contrast, had nearly 15 years of leadership experience, a stronger compliance record, and was regularly sought out for guidance—even by Dorsett.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 84.**

85. Defendant's stated reason for Kalmick's termination—that he was dishonest about his office attendance—was also pretextual. Shorris never allowed Plaintiff to submit the attendance list he had requested. Moreover, Plaintiff was held to a stricter in-office standard than similarly situated employees, several of whom had lower attendance with no consequence.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 85.**

86. As a result of Defendant's unlawful conduct, Plaintiff has suffered including loss of income, emotional distress, reputational harm, and other compensable injuries.

**ANSWER: Curaleaf denies the allegations in Paragraph No. 86. Answering further, Curaleaf denies Plaintiff is entitled to any damages whatsoever.**

## COUNT II
## VIOLATION OF TITLE VII

87. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

**ANSWER: Curaleaf restates and re-alleges its answers to all other Paragraphs of this Complaint as though fully set forth herein.**

88. Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a) prohibits retaliation against individuals who oppose, report, or participate in proceedings concerning unlawful employment practices, including gender discrimination.

**ANSWER: Paragraph No. 88 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf states that Title VII speaks for itself, and Curaleaf denies any allegation in Paragraph No. 88 that is inconsistent therewith.**

89. In late February 2024, Plaintiff engaged in protected activity under Title VII by reporting to P&C Partner Barr that Shorris had made inappropriate gender-based comments about Compliance Director Montonye. Plaintiff reasonably believed these comments reflected unlawful sex-based bias.

**ANSWER: Paragraph No. 89 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 89.**

90. On or about March 11, 2024, Plaintiff was denied a promotion to Vice President of Compliance for the Central Region—less than two weeks after his protected disclosure. This adverse employment action occurred in close temporal proximity to Plaintiff's report and supports a strong inference of retaliation.

**ANSWER: Paragraph No. 90 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 90.**

91. Less than two months later, Defendant terminated Plaintiff on May 20, 2024—supporting a strong inference that the termination was in retaliation for protected activity.

**ANSWER: Paragraph No. 91 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits it terminated Plaintiff's employment on or about May 20, 2024. Curaleaf denies the remaining allegations in Paragraph No. 91.**

92. Defendant failed to follow its own disciplinary policies and gave inconsistent reasons for Plaintiff's termination. Shorris cited "dishonesty," while the personnel file listed "performance issues." Plaintiff had a stellar record and was never placed on a performance improvement plan. These shifting explanations are evidence of pretext.

**<u>ANSWER</u>: Paragraph No. 92 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits Plaintiff was dishonest and had performance issues. Curaleaf further admits Plaintiff was not placed on a performance improvement plan. Curaleaf denies the remaining allegations in Paragraph No. 92.**

93. Plaintiff's belief that Shorris engaged in gender discrimination is further supported by Curaleaf's Compliance Department Engagement Survey, which documented concerns about gender bias in leadership. The findings included, in part, the following: "Compliance & Non-Compliance Leadership has exhibited biases towards different genders in the facilities. The perspective of male employees is favored while women in management roles are not included in important discussions. Having conversations with the HR team and/or the ethics hotline has been considered, but there's a lack of trust that anonymity will be maintained or retaliation may be experienced." Per Curaleaf Ethics Reporting Policy, Shorris, in his role as Chief Compliance Officer, sits on the Ethics Committee that receives and reviews issues submitted via this hotline.

**<u>ANSWER</u>: Paragraph No. 93 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits an Engagement Survey was conducted, which included, among other things, concerns of gender bias in leadership. Answering further, Shorris saw the results of the survey. Curaleaf denies the remaining allegations in Paragraph No. 93.**

94. As a result of Defendant's unlawful retaliation, Plaintiff has suffered damages, including loss of income, emotional distress, and reputational harm.

**ANSWER: Paragraph No. 94 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 94 and further denies Plaintiff suffered any damages based upon Curaleaf's conduct.**

**COUNT III**
**VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT**

95. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

**ANSWER: Curaleaf restates and re-alleges its answers to all other Paragraphs of this Complaint as though fully set forth herein.**

96. The Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101, et seq., prohibits retaliation against individuals who oppose, report, or participate in proceedings concerning unlawful discrimination under the Act.

**ANSWER: Paragraph No. 96 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf states that the IHRA speaks for itself, and Curaleaf denies any allegation in Paragraph No. 96 that is inconsistent therewith.**

97. In late February 2024, Plaintiff engaged in protected activity under the IHRA by reporting to P&C Partner Barr that Shorris had made inappropriate and gender-based remarks about Compliance Director Montonye, a woman. Plaintiff reasonably believed those comments—regarding her demeanor, tone, and leadership style—reflected gender bias and unlawful discrimination.

**ANSWER: Paragraph No. 97 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 97.**

98. On or about March 11, 2024—less than two weeks later—Defendant denied Plaintiff a promotion to Vice President of Compliance for the Central Region. This adverse action occurred in close temporal proximity to his protected activity and supports a strong inference of retaliation. The decision was also pre-textual, as Plaintiff was objectively more qualified than the individual who received the promotion.

**<u>ANSWER</u>: Paragraph No. 98 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits it did not promote Plaintiff to the position of Vice President of Compliance for the Central Region in March 2024. Curaleaf denies the remaining allegations in Paragraph No. 98.**

99. On or about April 4, 2024, Plaintiff again engaged in protected activity by reporting that Shorris had subjected another female subordinate, Megan O'Brien, to disparate treatment on the basis of sex. Plaintiff reasonably believed this conduct also constituted unlawful discrimination under the IHRA.

**<u>ANSWER</u>: Paragraph No. 99 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 99.**

100. On May 20, 2024, just six weeks after Plaintiff's second report, Defendant terminated him. Defendant failed to follow its own progressive discipline procedures and gave inconsistent reasons for his discharge. While Shorris cited "dishonesty," the personnel file listed "performance issues." Plaintiff had a consistent record of positive reviews and had never been placed on a performance improvement plan. These shifting justifications are evidence of pretext.

**<u>ANSWER</u>: Paragraph No. 100 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits Plaintiff was dishonest and**

**had performance issues. Curaleaf further admits Plaintiff was not placed on a performance improvement plan. Curaleaf denies the remaining allegations in Paragraph No. 100.**

101. Plaintiff's belief that unlawful gender discrimination occurred is corroborated by the Compliance Department's 2024 Engagement Survey, which documented perceptions of gender bias in leadership, exclusion of women from key discussions, and fear of retaliation for reporting such concerns. Shorris, as Chief Compliance Officer, sat on the Ethics Committee responsible for reviewing such complaints. The findings of the survey included, in part, the following: "Compliance & Non-Compliance Leadership has exhibited biases towards different genders in the facilities. The perspective of male employees is favored while women in management roles are not included in important discussions. Having conversations with the HR team and/or the ethics hotline has been considered, but there's a lack of trust that anonymity will be maintained or retaliation may be experienced." Per Curaleaf Ethics Reporting Policy, Shorris, in his role as Chief Compliance Officer, sits on the Ethics Committee that receives and reviews issues submitted via this hotline.

**ANSWER: Paragraph No. 101 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf admits Shorris initiated an Engagement Survey and received the results of that survey, which included, among other things, concerns of gender bias in leadership. Curaleaf denies the remaining allegations in Paragraph No. 101.**

102. As a result of Defendant's unlawful conduct, Plaintiff has suffered damages including loss of income, emotional distress, reputational harm, and other compensable injuries.

**<u>ANSWER</u>: Paragraph No. 102 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 102 and further denies Plaintiff suffered any damages based upon Curaleaf's conduct.**

## COUNT IV
## RETALIATORY DISCHARGE AT COMMON LAW

103. Plaintiff realleges and incorporates all preceding paragraphs as though fully set forth herein.

**<u>ANSWER</u>: Curaleaf restates and re-alleges its answers to all other Paragraphs of this Complaint as though fully set forth herein.**

104. Under Illinois law, an employee may bring a claim for retaliatory discharge where the termination violates a clearly mandated policy. *See Brandon v. Anesthesia & Pain Mgt. Associates, Ltd.*, 277 F.3d 936, 940–41 (7th Cir. 2002).

**<u>ANSWER</u>: Paragraph No. 104 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf states that Illinois case law and the cited case speak for themselves, and Curaleaf denies any allegation in Paragraph No. 104 that is inconsistent therewith.**

105. Plaintiff complained in good faith about what he believed to be the enforcement of an unwritten policy that obstructed lawful disclosures to government regulators, including the IDOA, concerning violations of state and federal law.

**<u>ANSWER</u>: Paragraph No. 105 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 105.**

106. Plaintiff also complained in good faith about what he believed to be gender-based discrimination by Shorris against O'Brien.

**ANSWER: Paragraph No. 106 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 106.**

107. Defendant retaliated by denying Plaintiff a promotion and ultimately terminating him because he refused to stop reporting compliance violations and continued communication with regulators, and because he reported gender-based discrimination concerns.

**ANSWER:**

**Paragraph No. 107 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 107.**

108. As a result of Defendant's unlawful conduct, Plaintiff has suffered including loss of income, emotional distress, reputational harm, and other compensable injuries.

**ANSWER: Paragraph No. 108 sets forth legal conclusions to which no answer is required. To the extent an answer is required, Curaleaf denies the allegations in Paragraph No. 108.**

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the entry of judgment in his favor, and against Defendant and award the following relief:

1. Declare that the acts and conduct of Defendant are unlawful and violate the Illinois Whistleblower Act, the IHRA, Title VII, and common law;
2. Award Plaintiff the value of all compensation and benefits lost as a result of Defendant's unlawful conduct;
3. Award Plaintiff the value of all compensation and benefits he will lose in the future as a result of Defendant's unlawful conduct;

4. Award Plaintiff compensatory damages, including but not limited to damages for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

5. Award Plaintiff pre-judgment and post-judgment interest;

6. Award Plaintiff punitive damages as appropriate;

7. Award Plaintiff attorneys' fees and costs; and

8. Award Plaintiff such other make-whole equitable, injunctive, and legal relief as this Court deems just and proper.

**ANSWER: Curaleaf denies Plaintiff is entitled to the relief requested and further denies he is entitled to any relief whatsoever. Curaleaf further denies the allegations in the "WHEREFORE" clause and paragraphs (1) through (8) that follow the same.**

**JURY DEMAND**

Plaintiff demands trial by jury on all issues so triable.

**ANSWER: Curaleaf admits Plaintiff demands a trial by jury. Curaleaf, too, requests a trial by jury.**

**CURALEAF'S AFFIRMATIVE DEFENSES**

1. Any actions taken by Curaleaf which may have affected Plaintiff were undertaken in good faith, without malice or recklessness, not in response to any protected activity, and were within the execution of the duties imposed on it by applicable law. Stating further, the alleged retaliatory action was predicated solely upon grounds other than Curaleaf's exercise of any rights protected by the Illinois Whistleblower Act.

2. Plaintiff's Complaint is barred because if fails in whole or in part to state a claim upon which relief can be granted.

3. Curaleaf states that, to the extent Plaintiff is asserting claims which occurred outside the applicable statute of limitations period and/or to the extent Plaintiff has failed to exhaust his administrative remedies, such claims are time-barred.

4. Curaleaf states that all decisions made with respect to Plaintiff were lawful and based entirely on legitimate non-discriminatory, non-retaliatory reasons.

5. Plaintiff may not recover punitive damages under the applicable law because Curaleaf implemented policies and made good faith efforts to comply with all state and federal laws regarding anti-discrimination, anti-retaliation, and safety. Moreover, punitive damages are not recoverable under the Illinois Human Rights Act.

6. Plaintiff has failed to mitigate his damages, if any.

7. Plaintiff's claims are barred by his unclean hands.

8. Plaintiff's damages, if any, were directly and proximately caused by his own conduct and actions and through no fault of any conduct or action by Curaleaf.

9. Curaleaf did not violate any duty to or right of Plaintiff.

10. At all relevant times, Curaleaf acted reasonably, in good faith and with due diligence toward Plaintiff.

11. Plaintiff did not have a reasonable and/or good faith belief that the conduct he allegedly reported was a violation of law.

12. Plaintiff's alleged protected conduct did not cause any alleged retaliation because there is no evidence that Curaleaf knew of the alleged protected activity.

13. Curaleaf reserves the right to assert additional affirmative defenses or other defenses and file such amended answers and defenses as may be appropriate in light of Curaleaf's ongoing investigation and discovery.

WHEREFORE, Defendant Curaleaf, Inc. requests that judgment be entered in its favor and against Plaintiff Matthew Kalmick and that Curaleaf be awarded its costs and disbursements in this action, including attorneys' fees and for any further relief the Court deems just and proper.

Dated: February 17, 2026

By: *__/s/ Heather A. Bailey__*

Heather A. Bailey, Esq. (ARDC # 6274501)
Laurie I. Smigielski, Esq. (ARDC # 6297645)
Amundsen Davis, LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3266
hbailey@amundsendavislaw.com
lsmigielski@amundsendavislaw.com
*Attorneys for Defendant Curaleaf, Inc.*

## CERTIFICATE OF SERVICE

The undersigned certified that on February 17, 2026, I electronically filed the foregoing **Defendant Curaleaf, Inc.'s Amended Answer and Affirmative Defenses to Plaintiff's Complaint** with the Clerk of Court using the CM/ECF system, which will send a notice of the electronic filing to all counsel of record.

Dated: February 17, 2026 By: */s/ Heather A. Bailey*

Heather A. Bailey, Esq. (ARDC # 6274501)
Amundsen Davis, LLC
150 North Michigan Avenue, Suite 3300
Chicago, Illinois 60601
(312) 894-3266
hbailey@amundsendavislaw.com
*Attorney for Defendant Curaleaf, Inc.*